**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| LEARNING RESOURCES, INC.; HAND2MIND, INC.; HMTX INDUSTRIES LLC; HALSTEAD NEW ENGLAND CORPORATION; METROFLOR CORPORATION; SHANNON SPECIALTY FLOORS LLC; AND SHOPHMTX LLC, <br><br> *Plaintiffs*, <br><br> v. <br><br> THE UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, in his official capacity as Commissioner of United States Customs and Border Protection; OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE; JAMIESON GREER, in his official capacity as United States Trade Representative, <br><br> *Defendants*. | Court No. 1:26-cv-3347 <br><br><br> THREE-JUDGE PANEL REQUESTED |

**<u>COMPLAINT</u>**

Plaintiffs Learning Resources, Inc., hand2mind, Inc., HMTX Industries LLC, Halstead New England Corporation, Metroflor Corporation, Shannon Specialty Floors LLC, and ShopHMTX LLC, by and through their attorneys, allege and state as follows:

1. This action challenges the Administration's third attempt—under a third proffered statutory authority, after the first two attempts were held invalid—to impose essentially the same set of sweeping global tariffs on virtually all imports into the United States. The third time's *not* the charm.

2. Plan A, announced in April 2025, involved baseline reciprocal tariffs imposed on every U.S. trading partner under the International Emergency Economic Powers Act ("IEEPA"). After this Court found them unlawful, the U.S. Supreme Court struck down those tariffs as unauthorized in February 2026. *See Learning Res., Inc. v. Trump*, 607 U.S. 229 (2026).

1

3.      The very same day the Supreme Court nixed Plan A, the Administration announced Plan B: the temporary imposition of similar global tariffs, predicated on a different economic emergency, under Section 122 of the Trade Act of 1974 (the "Trade Act").  That action (the "Global Section 122 Tariffs") was also challenged, and also deemed unlawful by this Court, in May 2026.

4.      Given those court challenges—as well as Section 122's 150-day limit on tariff actions—Defendants wasted no time in concocting Plan C (the action challenged here): a reincarnated global tariff regime imposed under Section 301 of the Trade Act on more than $1 trillion in goods (the "Global Section 301 Tariffs").

5.      Defendants made no bones about the fact that they intended to use Section 301 as an "alternative tool[]" to "address many of the issues at the heart of the President's reciprocal tariff program."  Press Release, Office of the United States Trade Representative, Ambassador Greer Issues Statement on Supreme Court IEEPA Decision (Feb. 20, 2026) (*"USTR Statement on IEEPA Decision"*). [1]  They thus launched highly abbreviated investigations into the forced-labor importation laws and enforcement practices of 60 diverse economies comprising 86 countries (the "Targeted Economies") and their purported burden on U.S. commerce.  Following those rushed two-month investigations and perfunctory public comment periods, the U.S. Trade Representative ("USTR") pinned its execution down to the minute.  To keep its existing global tariff wall intact as promised, and with seven hours' notice, USTR decreed that the Global Section 301 Tariffs would take effect—imposing 10% or 12.5% duties on all 60 Targeted Economies, which account for 99.4% of U.S. imports—at 12:01 a.m. on July 24, the very moment the Global Section 122 Tariffs lapsed.

---

[1]                                      https://ustr.gov/about/policy-offices/press-office/press-releases/2026/february/ambassador-greer-issues-statement-supreme-court-ieepa-decision.

6.      In short, Defendants have now tried to re-create materially the same global tariff regime under three disparate statutory authorities.  But there is a reason they did not begin with Section 301 and use it now only as a last resort.  Section 301's "demanding procedural prerequisites," *Learning Res.*, 607 U.S. at 244 (Opinion of Roberts, C.J.), require USTR to determine, on a country-by-country basis, that *each* of the 60 Targeted Economies have practices that are unreasonable, burden U.S. commerce, and can be "appropriately" addressed by the tariffs USTR imposes.  The tariff action challenged here falls woefully short.  USTR asserts, in generic boilerplate language, that all 60 economies have unreasonable and burdensome practices regarding the importation of goods made with forced labor.  Yet as its single investigative report makes clear, USTR relies on just a handful of country- and product-specific examples, none of which satisfy USTR's obligations to make specific the requisite findings as to each and every investigated economy.  Even then, Defendants' loosely extrapolated determinations are speculative on their face.  They conclude only that the actions of all 60 economies "may" "potentially" burden U.S. commerce in basically identical ways—despite the manifold differences in their commercial regimes—that purportedly justify nearly uniform across-the-board tariffs (*e.g.*, treating China and Costa Rica or Argentina and Trinidad & Tobago alike).  This Court should not countenance such an unprecedented, unsupported, and indiscriminate abuse of Section 301 to levy billions of dollars of taxes on Americans, including Plaintiffs' family-owned businesses and their customers.

7.      To be clear, Plaintiffs in no way, shape, or form condone reliance on forced labor or forced-labor imports.  But that is not the real issue here.  Defendants' pretextual and preordained determinations do not satisfy the statutory requirements of Section 301 or the applicable Administrative Procedure Act ("APA") standards.  The charade must stop.  This Court should declare the Global Section 301 Tariffs unlawful and vacate them.

**PARTIES**

8.      Plaintiffs Learning Resources, Inc. and hand2mind, Inc. are private, family-owned American companies, headquartered in Vernon Hills, Illinois, that develop, market, and sell educational products, educational toys, and pet toys.  Plaintiffs market products under brands including LEARNING RESOURCES, EDUCATIONAL INSIGHTS, HAND2MIND, and BRIGHTKINS, and are a world leader in the development of experiential, hands-on learning materials which are sold in more than 100 countries.  Plaintiffs have more than 500 employees and full-time equivalents today, and have offices in Vernon Hills, Illinois; Torrance, California; and Amherst, New York.  Plaintiffs develop their products (and perform some manufacturing and assembly) in the United States, but outsource most manufacturing to factories in other countries, including (but not limited to) China, Taiwan, South Korea, Vietnam, Thailand, and India.  Plaintiffs Learning Resources and hand2mind import products under various HTSUS subheadings that are subject to the Global Section 301 Tariffs.

9.      Plaintiff HMTX is a private, family-owned American company headquartered in Connecticut that designs, markets, and sells innovative resilient flooring products.  HMTX has more than 220 U.S. employees and full-time equivalents at locations in Norwalk, Connecticut; Smyrna, Georgia; Calhoun, Georgia; Rincon, Georgia; York, Pennsylvania, and Mequon, Wisconsin.  HMTX's products are manufactured in Pittston, Pennsylvania and other countries including but not limited to Mexico, Thailand, China, Vietnam, and Korea.  Through its wholly owned companies—Plaintiffs Halstead New England Corporation, Metroflor Corporation, Shannon Specialty Floor LLC, and shopHMTX LLC—HMTX sells its products throughout the United States with particular emphasis on the residential renovation and home improvement

4

market.  The HMTX companies import luxury vinyl tile classified under HTSUS subheading 3918.10.1000, which is subject to the Global Section 301 tariffs.

10.     Defendant United States of America receives the disputed tariffs and is the statutory defendant under 5 U.S.C. § 702 and 28 U.S.C. § 1581(i)(1)(B).

11.     Defendant U.S. Customs and Border Protection ("CBP") is the agency that collects duties on imports.  CBP collects payments made by Plaintiffs to account for the Global Section 301 Tariffs imposed by USTR.

12.     Defendant Rodney S. Scott is the Commissioner of CBP.  In this capacity, he oversees CBP's collection of duties paid by Plaintiffs under the Global Section 301 Tariffs.

13.     Defendant the Office of the U.S. Trade Representative ("USTR") is an executive agency of the United States charged with investigating a foreign country's trade practices under Section 301 of the Trade Act and implementing "appropriate" responses.  USTR conducted the Section 301 investigation at issue and made numerous decisions regarding the Global Section 301 Tariffs, including promulgation of the final tariff action challenged here.

14.     Defendant Ambassador Jamieson Greer currently holds the position of USTR and serves as the director of the Office of the USTR.  In these capacities, he made numerous decisions regarding Global Section 301 Tariffs.

**JURISDICTION**

15.     The Court possesses subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1581(i)(1)(B), which confers "exclusive jurisdiction" to the Court over "any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for . . . tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue."  28 U.S.C. § 1581(i)(1)(B).

5

**THREE-JUDGE PANEL REQUEST**

16.     Plaintiffs request that the Chief Judge of this Court designate three judges "to hear and determine" this action because it "(1) raises an issue of the constitutionality of an Act of Congress, a proclamation of the President or an Executive order" or "(2) has broad or significant implications in the administration or interpretation of the customs laws."  28 U.S.C. § 255.

**STANDING**

17.     Plaintiffs have standing to sue because they are "adversely affected or aggrieved by agency action within the meaning of" the APA.  5 U.S.C. § 702; *see* 28 U.S.C. § 2631(i) ("Any civil action of which the Court of International Trade has jurisdiction *** may be commenced in the court by any person adversely affected or aggrieved by agency action within the meaning of Section 702 of title 5.").  The Global Section 301 Tariffs imposed by Defendants adversely affect and aggrieve Plaintiffs because, as domestic importers of covered goods, they are required to pay the unlawful duties directly to the government.  For the same reasons, Plaintiffs have Article III standing.  *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) ("If a defendant has caused physical or monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III.").

**RELEVANT LAW**

18.     Section 301(b) of the Trade Act of 1974 authorizes USTR to take "appropriate" action, "subject to the specific direction, if any, of the President," "to obtain the elimination of" a foreign country's practice if an investigation reveals that the practice is both "unreasonable or discriminatory" and "burdens or restricts United States commerce."  19 U.S.C. § 2411(b)(1), (2).

19.     Before USTR may take such action, it must conduct an investigation into the allegedly unreasonable activities, 19 U.S.C. § 2412; consult with committees representing the

6

private sector and state and local governments, *id.* §§ 2412(b)(1)(B), 2415; consult with the investigated foreign country, *id.* § 2413; and publish its determinations and the factual basis for them in the Federal Register, *id.* § 2414(c).

20.   Section 304 of the Trade Act gives USTR 12 months after the initiation of the underlying investigation to determine what action, if any, to take against the investigated country. 19 U.S.C. § 2414(a)(1)(B), (2)(B).

21.   Section 307 of the Trade Act allows USTR to "modify or terminate" an action taken pursuant to Section 301 of the Trade Act, "subject to the specific direction, if any, of the President," either when the "burden or restriction on United States commerce" imposed by the investigated foreign country's practice has "increased or decreased" or when the action "is no longer appropriate."  19 U.S.C. § 2417(a)(1)(B), (C).

## BACKGROUND

**A.     Defendants Impose Global Tariffs Under IEEPA**

22.   Sweeping global tariffs were a central feature of President Trump's 2024 Presidential campaign, in which he repeatedly promised to impose "10 percent to 20 percent tariffs on foreign countries that have been ripping us off for years."  James Bickerton, *Donald Trump's Tariff Proposal Sparks Warning From Economists*, NEWSWEEK (Aug. 19, 2024).[2]

23.   Shortly after taking office in 2025, President Trump tried to make good on that promise despite the "strict limits" that Congress has placed on the delegation of its tariff powers. *Learning Res.*, 607 U.S. at 243 (Opinion of Roberts, C.J.).  To do so, the President issued a series of executive orders imposing global tariffs under IEEPA.  *See Fact Sheet: President Donald J.*

---

[2] https://www.newsweek.com/donald-trumps-tariff-proposal-sparks-warning-economists-1940395.

*Trump Imposes Tariffs on Imports from Canada, Mexico and China*, THE WHITE HOUSE (Feb. 1, 2025).[3]

24.     President Trump's widest-ranging IEEPA tariff action was his imposition of a baseline reciprocal tariff "on all imports from all trading partners," starting at 10% and later increasing for certain trading partners after implementation (the "Global IEEPA Tariffs").  Exec. Order No. 14,257, *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041, 15,045 (Apr. 2, 2025).  The President explained that the Global IEEPA Tariffs were intended to rectify "[l]arge and persistent annual U.S. goods trade deficits" that, in his view, had "led to the hollowing out of our manufacturing base; inhibited our ability to scale advanced domestic manufacturing capacity; undermined critical supply chains; and rendered our defense-industrial base dependent on foreign adversaries." *Id.* at 15,041.  Other countries' importation of products made with forced labor was not among the list of grievances identified by the Administration, nor was ending such practices among the Administration's stated goals in imposing the Global IEEPA Tariffs.

25.     Shortly after imposition of the Global IEEPA Tariffs, several private plaintiffs (including Plaintiffs Learning Resources and hand2mind) and a group of states filed multiple suits challenging President Trump's IEEPA tariffs on the ground that IEEPA does not authorize any tariffs at all, much less the President's unbounded ones.  The Supreme Court agreed and, on February 20, 2026, struck down the IEEPA tariffs.  *See Learning Res.*, 607 U.S. 229 (affirming the judgment of the Federal Circuit and this Court).  In so doing, the Supreme Court rejected the

---

[3]     https://www.whitehouse.gov/fact-sheets/2025/02/fact-sheet-president-donald-j-trump-imposes-tariffs-on-imports-from-canada-mexico-and-china/.

government's contention that IEEPA authorized the President to "impose tariffs on imports from any country, of any product, at any rate, for any amount of time." *Id.* at 240.

**B.      Defendants Announce Their Intention To Reimpose Global Tariffs Under Sections 122 And 301 Of The Trade Act**

26.    Anticipating a loss at the Supreme Court, Defendants had a fallback plan to allow the President to continue imposing his global tariffs. Even before the Supreme Court's decision, USTR Jamieson Greer (and other members of the Administration) outlined the intent to rely on other authority—namely, Sections 122 and 301 of the Trade Act—to replicate the Global IEEPA Tariffs.[4]

27.    Once the Supreme Court issued its decision in *Learning Resources*, USTR promptly confirmed its plan. USTR announced that "alternative tools would be implemented to address many of the issues at the heart of the President's reciprocal tariff program." *USTR Statement on IEEPA Decision, supra*. USTR then expressly identified Sections 122 and 301 of the Trade Act as mechanisms the Administration would use "to ensure continuity in reaching" President Trump's goals of "reducing the U.S. global trade deficit in goods, reversing the lack of reciprocity by our foreign trading partners, and incentivizing the reshoring of production to the United States." *Id.* Specifically, and as detailed below, USTR explained that it would "[i]mmediately impose a temporary 10 percent surcharge on articles imported into the United States, pursuant to Section

---

[4] *See, e.g.*, CNBC TELEVISION, *USTR Jamieson Greer on EU Tech Fines: Number of Investigations We Could Conduct to Take Action*, at 04:21 (YouTube, Dec. 18, 2025), https://www.youtube.com/watch?v=zEto_G57irI; CNBC TELEVISION, *Watch CNBC's Full Interview with Commerce Secretary Howard Lutnick*, at 06:33 (YouTube, Sep. 5, 2025), https://www.youtube.com/watch?v=gx24QIEqbS0&t=371s; NEW YORK TIMES EVENTS AND THE NEW YORK TIMES, *Treasury Secretary Scott Bessent Says He's 'Evolved' on Tariffs: Dealbook Summit 2025*, at 10:24 (YouTube, Dec. 3, 2025), https://www.youtube.com/watch?v=x_kUqOifBnc&t=624s; MORNINGS WITH MARIA, *Trump Economist Kevin Hassett: 'We're Looking at One of the Best Years We've Ever Seen'*, at 11:30 (Fox Business, Jan. 16, 2026), https://www.foxbusiness.com/video/6387812560112.

122 of the Trade Act of 1974," while it conducted Section 301 investigations into "most major trading partners \*\*\* on an accelerated timeframe." *Id.* (emphasis omitted).

**C.   Defendants Recreate Global Tariffs Under Section 122 Of The Trade Act**

28.   As promised, the same day as the Supreme Court's *Learning Resources* decision, Defendants announced a temporary 10% worldwide tariff pursuant to Section 122 of the Trade Act. *Fact Sheet: President Donald J. Trump Imposes a Temporary Import Duty to Address Fundamental International Payment Problems*, THE WHITE HOUSE (Feb. 20, 2026).[5]  The Global Section 122 Tariffs applied to virtually all articles imported into the United States, subject to narrow exemptions that substantially tracked the exemptions under the Global IEEPA Tariffs. *Compare* Annexes II & III, 90 Fed. Reg. at 15,049-15,109, *with* Proclamation No. 11012, Annexes I & II (Feb. 20, 2026); *see also* Fiama Angeles & Johannes Fritz*, From IEEPA To Section 122: What Changed on 20 February 2026,* GLOBAL TRADE ALERT (Feb. 21, 2026).[6]

29.   On May 7, 2026, this Court held that the Global Section 122 Tariffs exceeded the President's statutory authority and enjoined the federal government from imposing the tariffs against the parties before it. *Oregon v. United States*, Nos. 26-01472-3JP, 26-01606-3JP, 2026 WL 1257669, at \*13 (Ct. Int'l Trade May 7, 2026).  On June 11, 2026, the Federal Circuit stayed this Court's injunction pending appeal. *Oregon v. Trump*, Nos. 2026-1804, 2026-1805, 2026 WL 1702442, at \*1 (Fed. Cir. June 11, 2026).

30.   Regardless of the ultimate outcome of that challenge, because Section 122 empowers the President to impose temporary import duties for no more than 150 days, the Global Section 122 Tariffs were set to expire on July 24, 2026. *Oregon*, 2026 WL 1257669, at \*4.

---

[5]   https://www.whitehouse.gov/fact-sheets/2026/02/fact-sheet-president-donald-j-trump-imposes-a-temporary-import-duty-to-address-fundamental-international-payment-problems/.

[6] https://globaltradealert.org/blog/from-ieepa-to-section-122.

**D.    Defendants Again Recreate Global Tariffs Under Section 301 Of The Trade Act**

31.    After imposing tariffs under Section 122, USTR announced a plan to continue essentially the same worldwide tariffs under the auspices of Section 301.  Using Section 122's 150-day window as a bridge to its imposition of tariffs under Section 301, USTR explained that the agency would complete the required Section 301 investigations and impose new tariffs before the Global Section 122 Tariffs expired:  "By the time the five-month period has elapsed, we'll have completed investigations."  Tyler Kendall & Courtney Subramanian, *US Trade Probes Will Conclude Within Five Months, Greer Says*, BLOOMBERG LAW (Mar. 3, 2026).[7]  In so doing, USTR would avoid any interruption in the President's promised global tariff program.

*USTR's Section 301 Investigations*

32.    In the span of just two days in early March 2026, Defendants initiated 75 Section 301 investigations—an unprecedented number.  *See* Press Release, Office of the United States Trade Representative, USTR Initiates Section 301 Investigations Relating to Structural Excess Capacity and Production in Manufacturing Sectors (Mar. 11, 2026).[8]  Press Release, Office of the United States Trade Representative, USTR Initiates 60 Section 301 Investigations Relating to Failures to Take Action on Forced Labor (Mar. 12, 2026).[9]  By comparison, the federal government had initiated just 130 Section 301 investigations *in total* during the Trade Act's first 46 years.  *See* ANDRES B. SCHWARZENBERG, CONG. RSCH. SERV., R46604, SECTION 301 OF THE TRADE ACT OF 1974: ORIGIN, EVOLUTION, AND USE 26 (2020).[10]

---

[7]    https://www.bloomberg.com/news/articles/2026-03-03/us-trade-probes-will-conclude-within-five-months-greer-says.

[8]       https://ustr.gov/about/policy-offices/press-office/press-releases/2026/march/ustr-initiates-section-301-investigations-relating-structural-excess-capacity-and-production.

[9]       https://ustr.gov/about/policy-offices/press-office/press-releases/2026/march/ustr-initiates-60-section-301-investigations-relating-failures-take-action-forced-labor.

[10]  https://www.everycrsreport.com/reports/R46604.html.

33.    As relevant here, Defendants targeted 60 economies—accounting for 99.4% of all U.S. imports—each purportedly subject to a separate investigation but based on the same practices "related to the failure to impose and effectively enforce a prohibition on the importation of goods produced with forced labor." *Initiation of Section 301 Investigations of Acts, Policies, and Practices of Various Economies Related to the Failure To Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced With Forced Labor*, 91 Fed. Reg. 12,884, 12,884 (Mar. 17, 2026) (the "Global Section 301 Tariffs Investigation").  One of those investigated "economies," the European Union, comprises 27 countries, bringing the total number of countries investigated to 86.

34.    USTR solicited comments on its Global Section 301 Tariffs Investigation and held public hearings on April 28 and 29, 2026.  USTR received over 450 initial comments and more than 40 post-hearing rebuttal comments, many of which expressed concerns with the Administration's approach.  *See* OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, *Report in Section 301 Investigations of the Acts, Policies, and Practices of Various Economies Related to the Failure to Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced with Forced Labor*, 7 (June 2, 2026) (the "Global Section 301 Tariffs Report" or "Report").

*USTR's Global Section 301 Tariffs Report*

35.    On June 2, 2026, USTR published the results of its investigations in its Global Section 301 Tariffs Report.  Despite its breadth and unlike prior Section 301 investigations—which have typically taken more than six months to complete—the 60 supposedly separate Global Section 301 Tariffs investigations concluded in just two-and-a-half months.

36.    Reflecting the truncated nature of the investigations, the Report offered only conclusory findings at best—and, in many instances, no findings at all—with respect to the

statutory requirements that the practices of each of the 60 Targeted Economies were both "unreasonable or discriminatory" and "burden[] or restrict[] U.S. commerce."  19 U.S.C. § 2411(b)(1).

37.    *Unreasonableness*.    USTR concluded that all 60 Targeted Economies had unreasonably failed either to impose or to effectively enforce a prohibition on the importation of goods produced by forced labor.  Report 31-32.  That sweeping conclusion turned in the first instance on whether each Targeted Economy had an express prohibition on the importation of forced labor goods—and admittedly disregarded regimes in which multiple laws, taken together, amounted to a forced-labor import ban or in which laws discouraged such importation.  *Id*. at 20, 24-25.

38.    For those Targeted Economies with express prohibitions on the importation of forced labor goods, USTR arrived at the foreordained conclusion that they failed to "effectively enforce" their prohibitions.  Report 27-31.  For instance, USTR faulted multiple countries for failing to produce "evidence of any investigations, seizures, or other enforcement actions that have taken place to date," even though USTR acknowledged that many of those countries had "only recently imposed *** forced labor import prohibition[s]"—including through direct negotiations with, or at the direct urging of, Defendants.  *Id*.  Compounding these deficiencies, although USTR invoked Section 301(d)'s recognition that a "persistent pattern of conduct that *** permits any form of forced or compulsory labor" is unreasonable, *id.* at 5 (ellipsis in original), USTR failed to make the statutorily required finding that any such practice is also "inconsistent with the level of economic development of [each] [targeted] foreign country."  19 U.S.C. § 2411(d)(3).

39.    *Burden.*  The Report is devoid of the other critical element of Section 301: that each individual economy's use of an "unreasonable" practice actually burdens U.S. commerce.  USTR

concluded that each country's failure to effectively prohibit the importation of forced labor goods burdened or restricted U.S. commerce without making individualized findings for each (if any) of the 60 Targeted Economies.  Report 34-35.  Instead, USTR sought to extrapolate from a few anecdotal examples to support its claim that each Targeted Economy's purported failure to enforce forced-labor import bans actually burdened U.S. commerce by (1) forcing U.S. exports to compete with lower-priced forced-labor goods; (2) allowing bad actors to circumvent U.S. import controls; or (3) displacing fairly produced goods in the U.S. market.  *See id.* at 35.

40.    USTR's cherry-picked, country-specific examples of its first asserted burden—forcing U.S. exports to compete with lower-priced forced-labor goods—do not support extrapolation to the remaining Targeted Economies.  USTR argued, for example, that Poland's importation of tobacco from Malawi, a product allegedly at risk of forced-labor production, undercut competing American tobacco exporters.  But even putting aside every other Targeted Economy, *Poland* was not one of the investigated "economies"—the European Union, a common market with the same forced-labor restrictions applicable to all member countries, was.  And tobacco exports from the U.S. actually increased *more* across the European Union as a whole (by ~2.5X) than imports from Malawi increased (by <2X) over the period identified by USTR (2021-2025).  Report 86.  Indeed, the value of U.S. tobacco exports to Poland alone had grown more than tenfold from 2021 to 2025—from $1,266,000 to $21,109,000.  USTR's sparse evidence at best provides no support, and at worst actively undermines, the argument that Malawian tobacco had undercut the competitiveness of U.S. tobacco even in that single country.  *Id.* at 86.

41.    Moreover, Appendix A identified the predicate competition between American and Malawian tobacco in just 27 of the 60 Targeted Economies.  Report 84-86.  And, as in Poland and the European Union as a whole, in many of the Targeted Economies where such competition did

14

exist, USTR's own data showed that the value of U.S. tobacco exports had increased substantially during the showcased period (2021-2025). *Id.*

42. The examples USTR marshaled to illustrate its second asserted burden—that the Targeted Economies' practices burden U.S. commerce by enabling circumvention of U.S. import controls—similarly defy extrapolation. USTR pointed, for instance, to the incorporation of Chinese polysilicon and cotton into downstream products manufactured in third economies and then sold in the United States. *See* Report 47-55. As to polysilicon, USTR identified a few third economies in Southeast Asia alone; as to cotton, USTR identified intermediary manufacturers in just a handful of countries. *Id.* at 48-54. From those limited examples, USTR nevertheless leaped to the conclusion that all 60 Targeted Economies burdened U.S. commerce by "enabl[ing]" "circumvention." *Id.* at 54-55.

43. As to USTR's third asserted burden—displacing fairly produced goods in the U.S. market—USTR offered no concrete illustrations or data at all. *See* Report at 55.

44. There are other manifest flaws in USTR's purported burden showing. To begin with, USTR relied on just a few isolated trends in U.S. exports from 2015 or 2021 through 2025—without any showing that the importation of forced labor goods had become acute during those windows. It also relied on aggregate data tracking the *value*, rather than the *quantity*, of goods exported over time, notwithstanding the obvious distorting effect of inflation and other price-related factors. And USTR also repeatedly conceded that it could not isolate forced labor as the cause of any particular burden, frequently retreating to qualified assumptions and hedged conclusions. *See, e.g.*, Report 36 (forced labor "*may* *** be one of several factors*" "artificially reducing the price of such goods" (emphasis added)); *id.* at 42 ("Trends in the U.S. share of Spain's rice imports by volume *potentially* indicate that goods at risk of forced labor have affected US

15

exports." (emphasis added)). The Report's discussion of U.S. beef exports is illustrative. Although USTR speculated that "the United States would *likely* have experienced greater sales, revenues, and exports of beef to China, all else equal" in the absence of a forced labor import prohibition, *id.* at 46-47 (emphasis added), it simultaneously acknowledged that numerous unrelated factors could explain the same trend. Among them were "China's ban on beef from the United States prior to 2017 and the retaliatory tariffs it imposed in 2019 [in response to an earlier round of Section 301 tariffs]," which "also likely impacted the profitability of U.S. producers." *Id.* & n.153.

45.    The paucity and speculative nature of the evidence purportedly supporting undifferentiated burden findings against 60 different Targeted Economies is not surprising. Investigations under Section 301 are not designed to be used as a blunderbuss tool to justify the imposition of global tariffs in one fell swoop. That USTR's findings are so deficient is all the more predictable, given that USTR rushed to complete its investigations and final action in advance of the temporary Global Section 122 Tariffs' expiration. The Report here stands in stark contrast to the extensive body of prior Section 301 investigations and reports. Even on the rare occasions when USTR launched an investigation into multiple countries' practices, it engaged in detailed, separate country-by-country factfinding, producing exhaustive assessments of each country's practices and their attendant burdens on U.S. commerce.[11]

---

[11] When USTR initiated an investigation into ten countries and the European Union in 2019 and 2020 regarding their adopted or proposed digital services taxes, USTR issued seven different country-specific reports, each roughly six months after initiation, and roughly six months later announced seven different country-specific actions—each with tailored remedies taking into account the relative burden on U.S. commerce caused by each country's taxes. USTR terminated the investigations on the other economies because they did not adopt or implement digital services taxes during the investigation period. *See, e.g.*, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, *Report on India's Digital Services Tax Prepared in the Investigation Under Section 301 of the Trade Act of 1974* (Jan. 6, 2021); OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, *Report on Italy's Digital Services Tax Prepared in the Investigation Under*

*USTR's Notice of Determination*

46.    Three days after releasing its Report, USTR published a notice of its determinations and proposed tariff actions in the Federal Register. *See Notice of Determinations and Request for Comments Concerning Actions in Section 301 Investigations of Acts, Policies, and Practices of Various Economies Related to the Failure to Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced with Forced Labor*, 91 Fed. Reg. 34,272 (June 5, 2026) (the "Notice"). The Notice incorporated the Report by reference and formally proposed "to determine that *** appropriate action to obtain the elimination of the [targeted] acts, policies, and practices would include the imposition of ad valorem duties on all products of the" 60 Targeted Economies, subject to exemptions. *Id*. at 34,274.

47.    Specifically, USTR proposed a 10% tariff on six economies that currently have (but allegedly fail to effectively enforce) forced-labor import prohibitions, seven additional economies that have undertaken forced-labor related import commitments in Agreements on Reciprocal Trade with the United States, and one economy that has imposed a partial regime prohibiting the import of certain forced-labor goods. The remaining 46 Targeted Economies would be subject to a 12.5% tariff. Notice at 34,274.

48.    The Notice provided no explanation as to why tariffs in general, let alone tariffs of those magnitudes, were "appropriate" to obtain the elimination of the 60 Targeted Economies' purported failure to prohibit importation of forced labor goods. Not coincidentally, however, the proposed Global Section 301 Tariffs would closely track the baseline Global IEEPA and Section 122 Tariffs in rate (between 10% and 15%), scope (nearly all U.S. imports), and exemptions.

---

*Section 301 of the Trade Act of 1974* (Jan. 6, 2021); *see also Initiation of Section 301 Investigations of Digital Services Taxes*, 85 Fed. Reg. 34,709 (June 5, 2020).

17

*Compare* Proclamation No. 11012, Annexes I & II (Feb. 20, 2026), *with* 91 Fed. Reg. 34,277-32,344.  Indeed, despite insisting that frozen beef from Brazil was a prime example of an import at risk of being produced with forced labor, USTR nonetheless proposed to exempt that product from the Global Section 301 Tariffs, just as it had under the Global IEEPA and Section 122 Tariffs.

49.    USTR dedicated less than a page of its Notice to the nearly 500 comments it received related to its initiation of the Global Section 301 Tariffs Investigation.  91 Fed. Reg. at 34,275.   Its response was lackluster, addressing narrow aspects of whether the investigated practices were "unreasonable" and deferring consideration of objections to the agency's use of tariffs.  *Id.* at 34,274-34,275.  USTR conspicuously ignored the many commenters who argued the agency lacked evidence that each Targeted Economy's practices burden U.S. commerce.[12]

50.    USTR then solicited another round of public comments due July 6, 2026, and announced that it would convene public hearings beginning on July 7, 2026.  *Id.*

51.    During the second public comment period, USTR received over 1,600 comments.  It also held three days of public hearings, during which it announced that it would accept post-hearing rebuttal comments until July 16, 2026.  Commenters and witnesses once again expressed concern that USTR's Report lacked country-specific findings and relied on inconclusive data.[13]

---

[12] *See, e.g.*, Letter from Government of Costa Rica to United States Trade Representative, Re: Comments of the Government of Costa Rica for the Section 301 Investigation into the Acts, Policies and Practices of Various Economies Related to the Failure to Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced with Forced Labor (Apr. 15, 2026), https://comments.ustr.gov/s/commentdetails?rid=H6FWBDVBG2.

[13] *See, e.g.*, Letter from the Forced Labor Working Group to Ambassador Greer, Re: Comments of the Forced Labor Working Group in Response to the Notice of Determinations and Request for Comments Concerning Actions in Section 301 Investigations (July 6, 2026), https://comments.ustr.gov/s/commentdetails?rid=GR7KFP3QDP.

18

*USTR's Final Determination*

52.    On July 23, 2026, just seven days after the comment submission period had closed, USTR published notice of its final determination that 10% and 12.5% Global Section 301 Tariffs are "appropriate" to address each of the 60 Targeted Economies' failure to effectively enforce a prohibition on forced-labor imports. *See Notice of Actions in Section 301 Investigations of Acts, Policies, and Procedures of Various Economies Related to the Failure of Each Economy to Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced with Forced Labor* (July 23, 2026) (the "Final Determination").[14]  USTR also announced that the Global Section 301 Tariffs would take effect seven hours later at 12:01 a.m. eastern time on July 24—the *exact minute* the Global Section 122 Tariffs lapsed.

53.    With some minor modifications, USTR's Final Determination adopted the sweeping tariff actions contemplated in the agency's June 5 Notice.  The agency recognized that, subsequent to its June 5 Notice, four Targeted Economies had adopted forced-labor import prohibitions, and a fifth signed an Agreement on Reciprocal Trade with the United States.  As a result, those five Targeted Economies were shifted from a proposed 12.5% tariff in the Notice to a 10% tariff in the Final Determination.  *See* Final Determination 25-26, 28, 38, 40.

54.    In addition, USTR made the Global Section 301 duty rates for five economies— the European Union, Taiwan, Japan, South Korea, and Switzerland—net of the "most favored nation" or "MFN" rates that apply to those economies' products, meaning that the composite

---

[14] https://ustr.gov/sites/default/files/files/Press/Releases/2026/FLIP%20301%20Investigation%20Final%20Action%20FRN%207-23-26%20FINAL.pdf, *available in* Press Release, Office of the United States Trade Representative, USTR Takes Action in Forced Labor Section 301 Actions (July 23, 2026), https://ustr.gov/about/policy-offices/press-office/press-releases/2026/july/ustr-takes-action-forced-labor-section-301-investigations.

Section 301 and MFN rate on those economies' products generally would not exceed either 10% or 12.5%.[15]  Final Determination 12-13.  USTR attributed this accommodation to reciprocal trade agreements the Administration had negotiated with all five economies while the IEEPA tariffs were in effect, and before the Section 301 investigations were initiated, to modify the IEEPA duty rates so that the composite IEEPA duty rate and MFN rate generally would not exceed 15%.  *Id.* at 13.

55.    USTR also exempted a number of additional, discrete categories of goods from its otherwise sweeping tariffs.  Final Determination 13-14.  Ultimately, though, the tariffs imposed by the Final Determination retain the same core characteristics as the baseline Global IEEPA and Section 122 Tariffs they replaced: 10-12.5% taxes on virtually every product that enters this country.

56.    In the Final Determination, USTR also engaged with some comments questioning whether the Global Section 301 Tariffs were appropriate and requesting that certain goods be exempted or included therein.  *See* Final Determination 44-69.  Even so, the agency refused to confront arguments that USTR "failed to substantiate the existence of unreasonable acts, policies, or practices in each investigation, or *** failed to demonstrate a burden or restriction imposed by the acts, policies, and practices of each economy."  *Id.* at 44.

57.    Ultimately, the Report, Notice, and Final Determination confirm—consistent with the Administration's statements all along—what the record makes clear:  USTR's flimsy "findings" regarding forced-labor imports (including whether *each* country's practice individually burdened U.S. commerce) were reverse engineered to resurrect the global tariff wall torn down in *Learning Resources* and rebuilt under Section 122.  In twice insisting that each of its 60 Global

---

[15] The exception would be if the MFN rate already exceeds the composite Section 301 and MFN rate, in which case only the MFN rate would apply.

Section 301 Tariff actions "is only for the purpose of obtaining the elimination" of a Targeted Economies' forced-labor import practices "and not for any other purpose," USTR protests too much. Final Determination 70, 72.

## CLAIMS FOR RELIEF

### COUNT I
### The Global Section 301 Tariffs Were Promulgated Without Statutory Authority
### 5 U.S.C. § 706(2); 28 U.S.C. § 2640

58.    All prior paragraphs are incorporated by reference.

59.    The Final Determination is a final agency action subject to review under the APA and 28 U.S.C. § 2640(e) ("In any civil action not specified in this section, the Court of International Trade shall review the matter as provided in section 706 of title 5."). It marks the consummation of the agency's decision-making process because it announces USTR's implementation of the Global Section 301 Tariffs.

60.    A court shall "hold unlawful and set aside agency action, findings, and conclusions found to be *** not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C); *see* 28 U.S.C. § 2640(e).

61.    The President has no inherent authority to impose tariffs. The Constitution grants only Congress, not the President, the "Power To lay and collect Taxes, Duties, Imposts and Excises[.]" U.S. CONST. art. I, § 8, cl. 1.

62.    The only statute cited in the Final Determination as substantive authority to impose tariffs is Section 301. But the Final Determination plainly extends beyond its bounds. USTR's tariff authority under Section 301 is narrowly circumscribed. Section 301(b) allows USTR to take discretionary action only upon a determination that "an act, policy, or practice of *a* foreign country is unreasonable or discriminatory and burdens or restricts United States commerce." 19 U.S.C.

21

§ 2411(b)(1) (emphasis added).  Further, USTR must "determine what action, if any, [USTR] should take" that would be "appropriate and feasible *** to obtain the elimination of that act, policy, or practice."  *Id.* §§ 2414(a)(1)(B); 2411(b)(2).

63.    In order to take discretionary action under Section 301(b), USTR thus must make an individualized finding that the practices of "*a* foreign country"—*i.e.*, *each* Targeted Economy— are both "unreasonable" and impose a "burden[]" on U.S. commerce, and that USTR's chosen course of action is "appropriate" to obtain the elimination of that country's targeted practices.  *See Shum v. Intel Corp.*, 629 F.3d 1360, 1367 (Fed. Cir. 2010) (Congress's use of the definite article "the" "is evidence that what follows *** is specific and limited to a single party.").

64.    USTR's Report, which relies on generic conclusions extrapolated from a few anecdotal examples to cover 60 diverse economies and 99.4% of all U.S. imports, does not satisfy those statutory requirements.

65.    *First*, USTR did not make specific findings that *each* Targeted Economy's practices with respect to forced labor are "unreasonable."  Instead, USTR made only generic determinations that the "failure of each economy to impose and effectively enforce a forced labor import prohibition is unreasonable."  Report 34.  From there USTR concluded that *every major economy in the world,* apart from the United States, has been acting "unreasonably."  Moreover, USTR did not determine that the practices at issue were "inconsistent with the level of economic development of the [targeted] foreign country."  19 U.S.C. § 2411(d)(3).

66.    *Second*, USTR did not determine that the forced-labor import practices for *each* (if any) of the 60 Targeted Economies in fact "burden" U.S. commerce.  USTR offered only a handful of "illustrative" examples of goods that may be at risk of production by forced labor.  Even with

respect to those examples and countries, USTR only tentatively speculated that forced-labor import practices *might* burden U.S. commerce.

67. *Third*, USTR did not make any determination that a 10% or 12.5% tariff—or any tariff at all—would be "appropriate" to obtain the elimination of each targeted economy's forced-labor import practices.

68. Because USTR did not make individualized determinations that each of Section 301's statutory requirements have been met for each of the 60 Targeted Economies, the Global Section 301 Tariffs are unauthorized by Section 301. The statute does not support USTR's novel, unsupported, and unprecedented invocation of Section 301 to levy worldwide tariffs.

69. Because the Final Determination implements tariffs that lack statutory authorization and are *ultra vires*, Plaintiffs are entitled to vacatur of the Final Determination.

**COUNT II**
**The Global Section 301 Tariffs Are Arbitrary, Capricious, And Unsupported By Substantial Evidence**
**5 U.S.C. §§ 553, 706(2); 28 U.S.C. § 2640**

70. All prior paragraphs are incorporated by reference.

71. The court shall "hold unlawful and set aside agency action, findings, and conclusions found to be *** arbitrary [and] capricious" or "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (E); *see* 28 U.S.C. § 2640(e).

72. First, Defendants acted arbitrarily and capriciously by applying the same tariff rates to differently situated countries without any reasoned explanation for why uniform treatment is warranted. *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency acts arbitrarily and capriciously when it fails to consider relevant factors); *cf. Pepper v. United States*, 562 U.S. 476, 510 (2011) (Breyer, J., concurring in part and concurring in the judgment) ("A just legal system seeks *** to treat different cases differently.").

23

Rather than fashioning responsive actions tailored to address the varying circumstances of each Targeted Economy, Defendants repackaged the baseline global tariffs (with minor variations) previously imposed under IEEPA and Section 122.

73. Second, there is a fundamental "disconnect between the decision made and the explanation given." *Department of Com. v. New York*, 588 U.S. 752, 785 (2019); *see also id.* (identifying arbitrary and capricious action where the stated "explanation for agency action *** is incongruent with what the record reveals about the agency's priorities and decisionmaking process"). Defendants' own statements and actions reveal that they imposed the Global Section 301 Tariffs to reimpose the IEEPA tariffs struck down by the Supreme Court. Specifically, the record shows that, as soon as the Supreme Court declared the IEEPA tariffs unlawful, Defendants announced their intent to rely on Section 301 "to ensure continuity" with the invalid IEEPA tariffs and, in pursuit of that goal, immediately launched Section 301 investigations into "most major trading partners *** on an accelerated timeframe." *USTR Statement on IEEPA Decision*, *supra*. The record further shows that those accelerated investigations resulted in contrived, cursory, and conclusory determinations that the forced-labor importation practices of 60 different economies are each unreasonable, burdensome on U.S. commerce, and appropriately addressed through nearly uniform tariffs on countries accounting for 99.4% of all U.S. imports. The record further demonstrates that the Global Section 301 Tariffs largely track the rate, scope, and coverage of the baseline Global IEEPA Tariffs and the subsequent Global Section 122 Tariffs, confirming that Defendants' forced-labor rationale is less "an explanation for agency action," and "more of a distraction." *Department of Com.*, 588 U.S. at 785.

74. Third, the Final Determination is not supported by substantial evidence in the record. To the extent Defendants can be understood to have determined that each of the 60

Targeted Economies' forced-labor import practices are unreasonable, burden U.S. commerce, and will be eliminated by 10% or 12.5% tariffs, those determinations are unsupported by the record. Because the Report and Final Determination contain insufficient or no evidence from which Defendants could reach those conclusions, Plaintiffs are entitled to vacatur of the Final Determination.

75. Finally, Defendants failed to "consider and respond to significant comments received during the period for public comment." *HMTX Indus. LLC v. United States*, 156 F.4th 1236, 1256 (Fed. Cir. 2025) (quoting *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015)). Defendants had two different opportunities to address comments objecting to their reliance on faulty evidence and failure to make country-specific findings. Both the Notice and the Final Determination, however, are entirely silent on both counts.

76. Because the Final Determination is arbitrary and capricious, and unsupported by substantial evidence, Plaintiffs are entitled to vacatur of the Final Determination.

**COUNT III**
**The Global Section 301 Tariffs Violate The Nondelegation Doctrine**

77. All prior paragraphs are incorporated by reference.

78. The Constitution vests "[a]ll legislative Powers" in "Congress." U.S. CONST. art. I, § 1. This includes the power to "lay and collect *** Duties." *Id.* art. I, § 8, cl. 1.

79. The nondelegation doctrine requires Congress to "set out an 'intelligible principle' to guide what it has given the agency to do." *FCC v. Consumers' Rsch.*, 606 U.S. 656, 673 (2025) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)). Congress must provide "both 'the general policy' that the agency must pursue and 'the boundaries of [its] delegated authority.'" *Id.* (alteration in original) (quoting *American Power & Light Co. v Securities & Exch. Comm'n*, 329 U.S. 90, 105 (1946)). "The 'guidance' needed is greater ***

when an agency action will 'affect the entire national economy' than when it addresses a narrow, technical issue." *Id.* (quoting *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 475 (2001)).

80.    If the Trade Act is construed to allow Defendants to impose tariffs on countries accounting for 99.4% of U.S. imports based on speculation or pretext and without any country-specific accounting of burden on the U.S. economy or why a global tariff action is "appropriate" to remedy allegedly unreasonable forced-labor import practices, then the Trade Act lacks the necessary limiting principles on the Executive Branch's delegated taxing authority in violation of the nondelegation doctrine.

81.    To the extent the Final Determination is based on such an unconstitutional delegation of legislative power, this Court should declare it unlawful and award Plaintiffs all appropriate relief.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully request that this Court

1. declare that Defendants' actions resulting in the Global Section 301 Tariffs were unauthorized by, and contrary to, the Trade Act;

2. declare that Defendants promulgated the Global Section 301 Tariffs in violation of the APA;

3. declare that, to the extent the Trade Act authorizes Defendants to impose a global tariff regime based on the record here, that action violates the nondelegation doctrine;

4. vacate the Global Section 301 Tariff Final Determination;

5. order Defendants to refund, with interest, any duties paid by Plaintiffs pursuant to the Global Section 301 Tariffs;

6. enjoin Defendants from applying the Global Section 301 Tariffs against Plaintiffs and collecting any duties from Plaintiffs pursuant to the Global Section 301 Tariffs;

7. award Plaintiffs their costs and reasonable attorney fees; and

8. grant such other and further relief as may be just and proper.

Dated: July 24, 2026                    Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　　　　*/s/ Pratik A. Shah*
　　　　　　　　　　　　　　　　　　　　　　　Pratik A. Shah
　　　　　　　　　　　　　　　　　　　　　　　James E. Tysse
　　　　　　　　　　　　　　　　　　　　　　　Matthew R. Nicely
　　　　　　　　　　　　　　　　　　　　　　　Devin S. Sikes
　　　　　　　　　　　　　　　　　　　　　　　Daniel M. Witkowski
　　　　　　　　　　　　　　　　　　　　　　　Kristen E. Loveland (*admission application pending*)
　　　　　　　　　　　　　　　　　　　　　　　AKIN GUMP STRAUSS HAUER & FELD LLP
　　　　　　　　　　　　　　　　　　　　　　　2001 K Street, N.W.
　　　　　　　　　　　　　　　　　　　　　　　Washington, D.C. 20006
　　　　　　　　　　　　　　　　　　　　　　　Telephone: (202) 887-4000
　　　　　　　　　　　　　　　　　　　　　　　pshah@akingump.com

　　　　　　　　　　　　　　　　　　　　　　　*Counsel for Plaintiffs*

27